IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

SHELLIE LYNN WEBBER,

                Plaintiff,

        v.

CAROLYN W. COLVIN,
Commissioner of Social Security

                Defendant.

No. 3:13-cv-02088-AC

FINDINGS AND RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

    Shellie Lynn Webber ("Webber") challenges the Commissioner's decision denying her application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"). This court has jurisdiction under 42

Page 1 - FINDINGS AND RECOMMENDATION

U.S.C. § 405(g).  For the reasons set forth below, the Commissioner's decision should be reversed and remanded for additional proceedings.

*Procedural Background*

Webber filed her applications for DIB and SIS on March 31, 2011, alleging disability since September 25, 2007, due to post-traumatic stress disorder ("PTSD"), severe anxiety, panic disorder, memory problems, osteoarthritis, high blood pressure, diabetes, and hypothyroid.  Webber also alleged she last worked on September 25, 2007, and her employer terminated her while she was on medical leave for plantar fasciitis.  Webber's applications were denied initially and upon reconsideration.  On January 23, 2013, after a timely request for a hearing, Webber appeared and testified before an administrative law judge ("ALJ").  Webber was represented by counsel, Lisa Porter.  Paul Morrison, a vocational expert ("VE"), also appeared and testified.

On February 6, 2013, the ALJ issued a decision finding Webber not disabled, as defined in the Act.  Webber filed a request for review of the ALJ's decision.  On September 18, 2013, the Appeals Council denied Webber's request for review of the ALJ's decision, making it the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 422.210.

*Discussion*

The court reviews the Commissioner's decision to ensure the proper legal standards were applied and the findings were supported by substantial evidence in the record.  42 U.S.C. § 405(g). *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  The ALJ applied the five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  The ALJ resolved Webber's claim at Step Four of that process, determining the severity of Webber's impairments, individually and in combination, did not

meet or medically equal the criteria of Listings § 1.02, § 12.04 and § 12.09. As such, Webber retained the residual functional capacity ("RFC") to perform her past work. Additionally, the ALJ also noted Webber could perform other work in the national economy.

A claimant's RFC is an assessment of the sustained work-related activities she can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96-8p. The ALJ assessed Webber's RFC as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) she can lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand and walk for at least 2 hours in an 8 hour day; she has no limitations on sitting; she can occasionally climb ramps and stairs, but can do no other climbing such as ladders, ropes, or scaffolding; occasionally balance, stoop, kneel, crouch, or crawl; she can perform simple, routine, repetitive tasks, but would be unable to sustain more complex or skilled work; and the work would best be performed without public contact.

(Tr. 25)[1]

Webber asserts several challenges to the ALJ's decision to deny her benefits application. Specifically, she contends first that the ALJ failed to adequately develop the record to permit a correct determination at either Step Three or Step Five. Next, Webber charges the ALJ erred when he determined drug used caused conditions of mental health without expert testimony. Thirdly, Webber contends the ALJ erred in assessing her credibility in light of her mental health problems. Finally, Webber maintains the ALJ failed to adequately consider her non-exertional limitations in developing her RFC.

---

[1] "Tr." refers to the official transcript of the administrative record. (Docket # 13.)

This court finds the ALJ must consider a fully developed record, including the post-hearing MRI report submitted for the first time to the Appeals Council. In addition, the ALJ failed to provide clear and convincing reasons for rejecting Webber's subjective testimony regarding her pain and symptoms. All of these issues must be resolved by the ALJ before a determination of disability can be made. As such, the court need not consider Webber's additional allegations of error as, upon remand, the ALJ is required to complete the five-step disability determination. Accordingly, the decision of the ALJ should be reversed and the case should be remanded for additional proceedings.

I.    Failure to Develop the Record

Webber maintains the ALJ and the Appeals Council "failed to account for new and material evidence -- the MRI of [her] left and right knee[s], which showed severe degenerative joint disease of both knees, most pronounced in medial and patellofemoral compartments, degenerative meniscal tearing and bilateral medial meniscal extrusion and large bilateral joint effusions with synovitis and intraarticular bodies." (Pl.'s Brief 25; Tr. 619-620.) Webber contends there was evidence in the record before the ALJ that additional medical testing of her knees was warranted. Specifically, Webber relies on this information in the record:

- At the Department of Disability Services level, investigation began for informal remand review because there was indication Webber may have met a listing regarding her left and right knees, her history plantar fasciitis, and her use of a cane or wheelchair due to bilateral knee osteoarthritis; they found the need for additional medical evidence after 08/31/11. (Tr. 582-583.)

- Medical evidence showed that once insured through the Oregon Health Plan, her treating provider J. Hobson PA intended to order a right knee x-ray and that "Bilateral knee MRI's to follow." (Tr. 472, 474.)

- Paul Tesar, MD, recommended an MRI scan. (Tr. 580.)

- Webber's medical providers continued to provide pain medication and pain contract refills for her severe knee pain during Webber's uninsured period.

- The ALJ was aware Webber had been referred for an MRI but was unable to afford one. (Tr. 53 (Q: "He said you needed an MRI and you never got it . . . . A: No, he wouldn't take my insurance."); *see also* Tr. 28 ("The record does not contain any evidence that the claimant obtained this MRI.").)

(Pl.'s Brief 25-26.)

Post-hearing, Webber underwent a magnetic resonance imaging ("MRI) procedure on both knees and submitted the results to the Appeals Council. The Appeals Council received the additional evidence and made it part of the record. (Tr. 5.) Nevertheless, without explanation, the Appeals Council found the additional evidence did not provide a basis for changing the ALJ's prior decision. Accordingly, the Appeals Council denied Webber's request for review of the ALJ's finding of not disabled. (Tr. 1-2.)

The Commissioner argues Webber failed to raise this issue before the ALJ and, therefore, waived any argument related to her severe degenerative joint disease in both knees. Additionally, the government contends the ALJ had no duty to order a consultative examination or MRI of Webber's knees because there were no inconsistencies in the record and there was adequate evidence to make a determination on her claim. (Def.'s Resp. 5.) Alternatively, the Commissioner insists there is substantial evidence in the record, including the subsequent MRI results, to support the ALJ's decision. According to the Commissioner, there is no new evidence that Webber is unable to "ambulate effectively within the meaning of 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.[2] In

---

[2]What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally

addition, the new evidence does not address Webber's ability to perform work tasks and, therefore, does not render the ALJ's RFC assessment as unsupported by substantial evidence.

Although the burden of establishing a disability belongs to the claimant, the Commissioner is tasked with developing the record. *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001); 20 C.F.R. §§ 404.1512(d)-(f), 416.912(d)-(f). When relevant medical evidence is incomplete, the ALJ has a duty to recontact the provider for clarification. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983) (ALJ has a "special duty to fully and fairly develop the record" even when claimant is represented by an attorney). "Critical to the fair and effective operation of the system for distributing social security benefits based on disability is the gathering and presentation of medical evidence." *Reed*, 270 F.3d at 841.

"One of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination, *i.e.*, 'a physical or mental examination or test purchased for [a claimant] at [the Social Security Administration's] request and expense.'" *Id.* (quoting 20 C.F.R.

---

as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2)  To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.

Page 6 - FINDINGS AND RECOMMENDATION

§§ 404.1519, 416.919). "[T]he Commissioner has broad latitude in ordering a consultative examination." *Id.* at 842 (quotation omitted). Although the government is not required to bear the expense of an examination for every claimant, some cases "normally require a consultative examination," including cases in which "additional evidence needed is not contained in the records of [the claimant's] medical sources" and cases involving an "ambiguity or insufficiency in the evidence [that] must be resolved." *Id.* (quoting 20 C.F.R. §§ 404.1519a(b)(1),(4) and 416. 919a (b)(1), (4)).

When making disability determinations:

If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence .... We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information.

20 C.F.R. § 404.1527(c)(3).

Here, the court need not decide whether the ALJ failed in his duty to fully develop the record when he did not order a consultative examination of Webber's knees, because the evidence in the record before this court includes the testing evidence Webber argues the ALJ should have obtained. Webber submitted post-hearing medical evidence to the Appeals Council – results from imaging tests of her knees – which the Appeals Council made part of the record. (Tr. 5, 619-20.) The Commissioner's regulations permit claimants to submit new and material evidence to the Appeals Council and require the Council to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision. 20 C.F.R. § 404.970(b).

Page 7 - FINDINGS AND RECOMMENDATION

20 C.F.R. § 404.970(b) provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

In addition, Ninth Circuit precedent dictates that the district court must consider the evidence Webber submitted for the first time to the Appeals Council. *Brewes v. Commissioner of Social Security Administration*, 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."); *see also Vasquez v. Astrue*, 572 F.3d 586, 595 n.7 (9th Cir. 2009) ("Because this evidence was submitted to and considered by the Appeals Council, and is part of the administrative record, this Court may consider it in reaching its final decision even though the ALJ did not have the benefit of this information during the initial hearing."); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1030 n.2 (9th Cir. 2007) (quoting *Ramirez*, court considers new evidence presented to the Appeals Council ); *Harman v. Apfel*, 211 F.3d 1172, 1180-81 (9th Cir. 2000) ("We properly may consider the additional materials because the Appeals Council addressed them in the context of denying appellant's request for review.").

The Commissioner does not argue the new evidence is not material or that it relates to a period after the date of the ALJ's written decision. Thus, the administrative record here includes evidence submitted to and considered by the Appeals Council and the question for the court is

whether this additional evidence renders the ALJ's decision as lacking in substantial evidence. In his written decision, the ALJ determined:

> The claimant's bilateral osteoarthritis/degenerative joint disease of the knees does not meet or medically equal listing 1.02 because there is no gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint, with involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively; or involving one major peripheral joint in each upper extremity, resulting in an inability to perform fine and gross movements effectively.

(Tr. 23.) In reaching this conclusion, the ALJ relied upon four views of Webber's left knee taken on July 20, 2009, that revealed medial compartment degenerative joint disease; and prepatellar superficial soft tissue swelling. (Tr. 26.) The ALJ also considered four views of Webber's right knee taken on March 29, 2011, that revealed tricompartment osteoarthritis, most pronounced involving the medial compartment; and large suprapatellar joint effusion. (Tr. 26.) Based upon these two tests the ALJ concluded Webber's joint disease did not meet or equal a § 1.02 listing. (Tr. 23.) While the ALJ was aware further testing had been ordered for diagnosis of Webber's knee condition, it was not performed until after the hearing.

If the ALJ had the benefit of the MRI taken in February 2013, he would have taken into account the conclusion by Dr. Craig Brooksby that Webber suffered severe degenerative joint disease in both knees. (Tr. 620) This objective medical evidence, paired with Webber's subjective reports of pain and disability, *i.e.*, use of a cane and wheelchair, renders the ALJ's RFC assessment not supported by substantial evidence. In fact, when posing the hypothetical to the VE, the ALJ assessed Webber as able to "stand and walk at least two hours during the workday[,]" and "occasionally climb

ramps and stairs[.]" (Tr. 75.) In addition, the ALJ concluded Webber could "occasionally balance, stoop, kneel, crouch or crawl." (Tr. 75.)

This additional evidence, admitted into the record by the Appeals Council, bears "directly and substantially" on the ALJ's disability determination. *See Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) (new evidence is material under section 405(g) if it bears "directly and substantially on the matter in dispute" and there is a "reasonable possibility" that the new evidence would have changed the outcome). Moreover, the court finds there is a reasonable possibility Dr. Brooksby's assessments, when considered with the other evidence of record, may have altered the ALJ's finding that Webber did not satisfy the criteria for a § 1.02 listing and she retained the RFC to perform her past relevant work. At this juncture, the record before the court includes evidence both supporting the conclusion Webber is disabled and that she is not. Resolving conflicts and ambiguities in the record is the ALJ's responsibility and further administrative proceedings are generally appropriate if the ALJ has not had the opportunity to consider significant additional evidence. *See, e.g., Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) (not appropriate to remand for an award of benefits based upon "evidence that the ALJ has had no opportunity to evaluate"). Accordingly, remand is appropriate to permit the ALJ an opportunity to consider Dr. Brooksby's report in determining whether Webber suffers a listed impairment, *i.e.,* inability to ambulate effectively, and to consider how the limitations set forth by Dr. Brooksby's affect Webber's RFC and her ability to work. *Id.* (remand is appropriate if the new evidence is material to a disability determination).

II.    Webber's Testimony

Webber maintains the ALJ erred in failing to consider her mental health problems when assessing her credibility. In addition, Webber contends the ALJ erred in concluding that because she was pursuing a conservative treatment regime, she suffered only a non-disabling condition.

The Commissioner contends the ALJ's decision makes clear the reasons for the weight he gave Webber's statements and testimony. (Tr. 28-29.) According to the government, the ALJ set forth clear and convincing reasons supported by substantial evidence for the credibility finding. (Tr. 28-29.) The Commissioner insists "the credibility determination is not inherently or patently unreasonable and the decision disclosed the ALJ's specific reasons in understandable language." (Def.'s Resp. 12.) The government maintains the ALJ provided a "plethora of reasons" for the credibility finding, including evidence of forgery. As such, the ALJ was not required to accept Webber's explanation. Relying on the Ninth Circuit's decision in *Chauldhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012), the Commissioner argues an ALJ may find a claimant with a mental impairment not fully credible, in part, for failure to seek treatment. Finally, the government contends even if the court finds the ALJ's reasons invalid, it should still uphold the ALJ's credibility finding because it is supported by substantial evidence.

At the hearing, Webber stated her onset of Sept. 25, 2007, was the date she was fired from her last employer's office. (Tr. 45.) Webber's plantar fasciitis required seven weeks off work for treatment and her employer terminated her. (Tr. 46.) Webber denied accusations that her employer fired her for stealing script pads and forging signatures for codeine syrup prescriptions. According to Webber's testimony, she attempted to work four weeks after treatment, but her doctor said it was too soon and sent a medical release. At that point, her employer terminated her on the grounds

Webber was unreliable and the employer needed help.  One week later, Webber's former employer called and accused her of stealing a prescription.  (Tr. 46-47.)  Webber then looked for part-time work because her podiatrist did not advise full-time work.  (Tr. 50-51.)

Webber takes many medicines with various side effects; she has a panic disorder, PTSD, and physical/mental disorders.  (Tr. 51.)  She also has gout and a bunion on her right foot, which is painful and swells; she has bone spurs on both heels, pain on left foot upon flexion and when sitting.  (Tr. 51.)  Webber testified she can sit almost a whole movie before the pain is overwhelming; she can stand no longer than five minutes because both knees have osteoarthritis.  (Tr. 52.)  Her knee problems began in 2008, and have continued to present day.  (Tr. 52.)  The ALJ noted Dr. Tesar did not recommend surgery, but advised that she needed an MRI.

The ALJ asked Webber why she did not undergo an MRI for her knees.  Webber stated she did not undergo MRI testing as recommended because Dr. Tesar would not accept her insurance, and prior authorization was required.  (Tr. 52, 55.)  Webber testified she was supposed to see a rheumatologist, rather than an orthopedic surgeon, due to her arthritis and gout.  (Tr. 55.)  The ALJ stated he did not see any evidence of rheumatoid arthritis, but instead osteoarthritis and noted "there's a big difference." (Tr. 55.)  The ALJ asked Webber whether she knew the difference "since you were in the medical field." (Tr. 55.)  Webber attempted to reiterate that her Physician's Assistant, Jane Hobson, stated she needed a rheumatologist, not an orthopedic surgeon, due to Webber's gout.  (Tr. 56.)

Webber stated she had a reaction to medication from Dr. Lawrence for gout that required a visit to the emergency room.  (Tr. 58.)  She had severe swelling and could not move her right leg and foot.  The doctors at the emergency room stated it was the colchicine.  (Tr. 58.)  Webber had an

Page 12 - FINDINGS AND RECOMMENDATION

appointment with a rheumatologist but she could not get in for two months. Webber testified that despite having pain since 2008, it was the first time a rheumatologist was mentioned. (Tr. 59.)

Webber takes oxycodone for her knee, foot and hip sciatica. A cane was prescribed and she was instructed to ice and elevate. Webber testified she also, on occasion, uses a wheelchair. (Tr. 59-60.) Side effects of the various medications prescribed at Dr. Kelly's office include lethargy, dry mouth, dizziness and drowsiness. (Tr. 60.) The ALJ asked if all the "ladies" treating Webber were aware of her prior drug history. (Tr. 60.) Webber seemed surprised and replied she had not had a problem with street drugs since her teen years. The ALJ persisted in questioning Webber about whether she ever had an alcohol problem. (Tr. 61.) Webber replied she never had an alcohol problem and was not permitted to drink on her current medications. In fact, Webber could not recall when she last had a beer. (Tr. 61.) Notwithstanding Webber's assertions, the ALJ referenced records to indicate Webber was having up to five beers every other night in 2008. (Tr. 61-62.) Webber again seemed surprised and asked when she was drinking at that level. The ALJ replied it was May 2008, and it included marijuana every night before bed. (Tr. 61.)

Webber insisted she never talked to a therapist at Columbia County Community Mental Health, but went there only for a prescriber. (Tr. 62.) The ALJ restated the records showed Webber abused methamphetamine and cocaine. (Tr. 63.) Webber apologized to the ALJ for laughing and testified the records were ludicrous. For example there were records from doctors Webber had never seen; and other errors, such as her visiting her father in Arizona who had lived in Oregon and was deceased. (Tr. 63.) Webber again stated she never had a problem with amphetamines. Tr. 63. In fact, her knowledge of cocaine and cannabis and street drugs was very poor. According to Webber's

testimony, she could not believe what she was hearing and she was unable to process what the ALJ was telling her because of her mental disorders. (Tr. 64.)

After taking some water and calming down, Webber explained that what just happened was a demonstration of her anxiety disorder; she gets scared easily, gets nervous, fumbles and does not make any sense. (Tr. 65.) Webber states that it happens three to four times a day and she takes medication to help the condition. (Tr. 65-66.) Although Webber is learning to manage some of her anxiety symptoms, she has begun developing agoraphobia. (Tr. 66.) Webber testified she misses appointments because of her mental health. Although she sleeps better now that she is heavily sedated at night, Webber needs daily naps to avoid being crabby. (Tr. 67.) For example, Webber's daughter-in-law calls before coming over with the grandchildren. (Tr. 68.)

The ALJ inquired about Webber's use of a wheelchair. Webber explained the wheelchair belonged first to her grandmother and then her sister. (Tr. 69.) Webber needed the wheelchair on occasion during this last year. (Tr. 70.) Webber testified she would need the wheelchair after the hearing because she had been sitting for a long time and, otherwise, it would be too difficult to get into the Jeep. (Tr. 70.) Also, Webber uses the wheelchair when she travels to Fort Lewis to visit her son. (Tr. 71.)

Webber testified her roommate, Shane, was very sick with chronic obstructive pulmonary disease and pancreatitis, but is much better now that he stopped drinking. (Tr. 71.) Shane works as a hydraulic repairman, fixing cranes, and he pays the rent. (Tr. 72.) Webber explained she and Shane are friends despite being very different. (Tr. 73.)

The ALJ is required to engage in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter*, 504 F.3d at 1035-36.

First, the ALJ must determine whether claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan,* 947 F.2d 341, 344 (9th Cir. 1991) *(en banc)* (internal quotation marks omitted); *accord Lingenfelter,* 504 F.3d at 1036. The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.; see also Reddick,* 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

Next, if a claimant meets the first test and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen,* 80 F.3d at 1281; *see also Carmickle v. Soc. Sec. Admin.,* 533 F.3d 1155, 1160 (9th Cir. 2008) ("The only time this standard does not apply is when there is affirmative evidence the claimant is malingering.").

As a preliminary matter, the Commissioner opposes the application of a clear and convincing standard of review to any aspect of the ALJ's decision, including the credibility determination. (Def.'s Resp. 11.) A clear and convincing reasons requirement is "not an easy requirement to meet" and is the most demanding standard imposed by the Ninth Circuit in Social Security cases. *Garrison v. Colvin,* 759 F.3d 995, 1015 (9th Cir. 2014) (citations omitted). The requirement "create[s] a high hurdle that must be cleared before discretion can be exercised," and results in an "exacting, across-

Page 15 - FINDINGS AND RECOMMENDATION

the-board standard of review." *Peugh v. United States*, 133 S.Ct. 2072, 2082, 2084 (2013) (citations omitted). According to the government, "the exacting clear and convincing reasons standard of review conflicts with the highly deferential substantial evidence standard of review which, by statute, applies to Defendant's factual findings such as credibility determinations." (Def.'s Resp. 11.) Instead the Commissioner asks this court to review the ALJ's decision "in accordance with SSR 96-7p . . . and[] determine whether the ALJ's decision contains specific, understandable reasons, and whether the credibility finding is 'inherently incredible or patently unreasonable.'" (Def.'s Resp. 11.)

The law in the Ninth Circuit is unequivocal – a clear and convincing standard applies to the district court's review of an ALJ's credibility determinations under the Social Security Act. *See, e.g., Garrison*, 759 F.3d at 1015 n.18 ("The government's suggestion that we should apply a lesser standard than 'clear and convincing' lacks any support in precedent and must be rejected.") This court is bound by that precedent and declines the Commissioner's invitation to ignore that well-established law.

Here, at Step Two of the five-step sequential disability determination analysis, the ALJ determined Webber suffered from a severe impairment – bilateral osteoarthritis/degenerative joint disease of the knees; history of plantar fasciitis; bipolar disorder; and polysubstance abuse, in claimed remission. (Tr. 22.) While the ALJ subsequently determined those impairments did not meet or medically equal the listings at Step Three, the ALJ's impairment finding at Step Two of the analysis indicates Webber presented objective medical evidence of underlying impairments that could reasonably cause some degree of the alleged symptoms. *See Bunnell*, 947 F.2d at 344 (The appropriate standard for evaluating pain in Social Security cases requires claimant to produce

Page 16 - FINDINGS AND RECOMMENDATION

medical evidence of an underlying impairment which is reasonably likely to be the cause of the alleged pain. If such evidence is produced, medical findings which support the severity of pain are not required.) Because Webber presented objective medical evidence of an underlying impairment, and there is no evidence of malingering, the ALJ was required by the second step of the credibility analysis to provide clear and convincing reasons for rejecting Webber's testimony. *See Lingenfelter*, 504 F.3d at 1036. Thus, the court must determine whether the ALJ satisfied that burden.

The ALJ provided five reasons for finding Webber was "only partially credible" and concluding he would "accord her statements and reports little weight." (Tr. 28.) First, the ALJ dismissed Webber's testimony because the treatment for her allegedly disabling condition has been "essentially routine and/or conservative in nature." (Tr. 28.) Second, Webber has "not always been compliant with her medications" and, at times, failed to pursue mental health treatment. (Tr. 28-29) Thirdly, the ALJ disregarded Webber's testimony because in February 2009, Webber was "still drinking a beer now and then" despite being advised in May 2008 to discontinue all alcohol use. (Tr. 29.) Next, the ALJ simply did not believe Webber's testimony that she left her last job because her employer would not grant her the medical leave she required. (Tr. 29.) Instead, the ALJ cited to Webber's history of polysubstance abuse and concluded her former employer's accusations of "stealing script pads" was the reason for her termination. Lastly, the ALJ determined Webber's description of her daily activities "suggest a higher level of functioning than that alleged by [Webber]." (Tr. 29.)

Based upon a careful review of the entire record, the court concludes the ALJ's stated reasons do not constitute clear and convincing reasons for rejecting Webber's subjective pain and symptom testimony. The ALJ's first reason, that Webber's treatment has been essentially routine or

Page 17 - FINDINGS AND RECOMMENDATION

conservative in nature, with no surgical intervention recommended, is contradicted by the evidence in this case and thus, cannot provide support for the lack of credibility finding. First, the ALJ acknowledged, and the record supports a conclusion, that Webber relies upon powerful pain medications, *i.e.*, oxycodone, in the management of her severe degenerative joint disease. In addition, Webber uses numerous medications to manage her anxiety condition. (Tr. 615 (listing of over twenty medications currently prescribed to Webber).) Certainly daily doses of over twenty medications, including oxycodone, trazadone, clonazepam and propranolo, can be considered neither routine nor conservative. Moreover, there is evidence in the record that Webber was not always insured and/or that her insurance was not comprehensive enough to cover some of the prescribed treatments. Thus, this reason for discounting Webber's testimony is not supported by substantial evidence in the record.

Second, the ALJ stated Webber has "not always been compliant with her medications" and, at times, failed to pursue mental health treatment. (Tr. 28-29) The record discloses Webber was uninsured until 2011, thus her decision to forego treatment prior to that time may not be considered as a basis for discounting her testimony. *See, e.g., Orn v. Astrue*, 495 F.3d 625, 628 (9th Cir. 2007) (ALJ required to consider explanation for failure to seek treatment); *Regennitter v. Comm'r of Social Security Administration*, 166 F.3d 1294, 1297 (9th Cir. 1999) ("[W]e have proscribed the rejection of a claimant's complaints for lack of treatment when the record establishes that the claimant could not afford it."). In addition, the very nature of her alleged disability, mental impairments, can play a role in her behavior with respect to treatments and medications. It is unclear what role poor judgment as opposed to "wellness" played in Webber's choices about treatment and medications. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("it is a questionable practice to chastise

one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."
(quotations and citation omitted)); *accord Garrison*, 759 F.3d at 1018 n.24; *compare Chauldhry*, 688
F.3d at 672 (no objective evidence of depression and *repeated* failures to seek treatment or follow
the prescribed course of treatment (emphasis added)). In fact, Webber testified that her mental health
issues, at times, prevented her from seeking treatment. (Tr. 66-67.) Under the circumstances of
Webber's significant mental health history, the ALJ was not permitted to discredit her testimony
without accounting for her mental impairments and lack of financial resources.

Third, the ALJ disregarded Webber's testimony because in February 2009, Webber was "still
drinking a beer now and then" despite being advised in May 2008 to discontinue all alcohol use. (Tr.
29.) In addition, the ALJ noted Webber's alleged failure to pursue any substance abuse treatment
during the period at issue. This second statement is conclusory and without support in the record.
There is no medical evidence that Webber was abusing drugs after April 2008. Further, there is no
authority for the ALJ to disregard Webber's subjective testimony on the ground she has a "beer now
and then[,]" even if she was advised to not drink.

Fourth, the ALJ simply did not believe Webber's testimony that she left her last job because
her employer would not grant her the medical leave she required. (Tr. 29.) Instead, the ALJ cited
to Webber's history of polysubstance abuse and concluded her former employer's accusations of
"stealing script pads" was the reason for her termination. Even if the ALJ is correct that Webber was
terminated for dishonesty, a matter Webber vigorously disputes, that reason alone is not a sufficient
showing of "clear and convincing" reasons for discounting her testimony.

Fifth and finally, the ALJ determined Webber's description of her daily activities "suggest a higher level of functioning than that alleged by [Webber]." (Tr. 29.) Specifically, the ALJ determined:

> In activities of daily living, the claimant has mild restriction. The claimant testified that her roommate Shane got ill last year, and that he was in and out of the hospital for months. On June 28, 2012, the claimant reported that her roommate had been hospitalized in February, and that she was helping to nurse him back to health. The claimant stated that she feeds, waters, and puts her pets outside. The claimant indicated that she had no problems with personal care, such as dressing, bathing, or feeding herself. The claimant indicated that she prepared her own food such as sandwiches and frozen dinners daily. The claimant stated that she vacuumed, cleaned the kitchen and bathroom, and did the dishes and laundry daily. The claimant reported that she is able to drive a car. The claimant indicated that she stopped for groceries and household items. The claimant stated that she was able to pay bills and count change.

The ALJ's characterization of Webber's ability to perform household chores was lifted from Webber's prior file "Function Report - Adult" filed on August 26, 2008, and was not based upon her direct testimony at the hearing on January 23, 2013. (Tr. 257-264.) The ALJ did not include all relevant portions of that Report, including Webber's statements that her daily activities included: "nap, feeling of sadness, frequent change in mood – lengthy periods of depression every day." (Tr. 257.) Webber also reported she was unable to stay in the kitchen for long, and Shane helps with the animals at night and on the weekends. (Tr. 258-259.) Webber rarely goes outdoors and does not want to speak with neighbors. (Tr. 260.) Finally, Webber stated she no longer engages in her hobbies. (Tr. 261.) Webber's ability to engage in some activities of daily living is not a legitimate basis for finding her not credible. That Webber makes an effort to engage in minimal chores at home, *i.e.*, heating frozen food, is not a clear and convincing reason for concluding her symptoms did not preclude her from maintaining employment. *See Orn*, 495 F.3d at 639 (ability to perform

activities that are so undemanding that they cannot be said to bear a meaningful relationship to activities required in the workplace); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability.")

The court finds the ALJ failed to articulate specific, clear and convincing reasons for his decision to exclude Webber's pain and symptoms testimony from the RFC assessment and, therefore, the RFC assessment is not supported by substantial evidence. *See Lingenfelter*, 504 F.3d at 1040-41. "Nor does substantial evidence support the ALJ's five-step determination since it was based on this erroneous RFC assessment" *Id.* at 1041. As such, the court must determine whether Webber's testimony should be credited as a matter of law, or whether this case should be remanded for additional proceedings. Webber argues that because the ALJ failed to provide clear and convincing reasons for rejecting her testimony that evidence should be credited as a matter of law, *i.e.*, credited as true. *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004).

Over twenty-five years ago, in *Varney v. Secretary of Health and Human Services (Varney II)*, 859 F.2d 1396, 1398-99, 1401 (9th Cir. 1988), the Ninth Circuit adopted a credit-as-true rule in cases where the ALJ failed to provide adequate justification for rejecting a claimant's pain testimony. Simply put, in those instances, the Commissioner must accept, as a matter of law, claimant's subjective testimony where there are no outstanding issues to be resolved before a disability determination can be made and where it is clear from the administrative record that benefits would be awarded if claimant's testimony was credited. *Id.* at 1041. Subsequently, in *Vasquez v. Astrue*, 572 F.3d 586 (9th Cir. 2009), the Ninth Circuit acknowledged that since *Varney II* was decided, a

split of authority had developed within the Circuit over whether the credit-as-true rule is mandatory or discretionary.  The court in *Vasquez* did not settle the conflict, however, because it found there were outstanding issues to be resolved before a proper disability determination could be made.  *Id.* at 591.[3]

Here, there is new medical testimony concerning Webber's impairments relevant to whether her limitations may satisfy the severity requirements of Listing § 1.02.  In addition, the ALJ must make specific findings, supported by clear and convincing reasons, regarding Webber's credibility. While the ALJ did posit a hypothetical to the VE that included some additional limitations, that hypothetical failed to consider limitations resulting from her severe degenerative joint disease.  Thus, the court is unable to find on this record that Webber is disabled and order an immediate payment of benefits.  *See, e.g., Harman*, 211 F.3d at 1178-79.  Consequently, a remand is warranted for the ALJ to consider the new medical evidence, resolve any conflicts in the record, and make specific findings regarding the medical source statements and Webber's testimony.  *Compare Moisa*, 367 F.3d at  887 ("there are no outstanding issues that must be resolved before a determination of disability can be made, and [] it is clear from the record that the ALJ would be required to find Moisa disabled if his testimony were credited); *see also INS v. Ventura*, 537 U.S. 12, 16 (2002) (*per curium*) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").

---

[3]The court in *Vasquez* credited claimant's testimony as true after noting that other factors may justify the application of the credit-as-true rule, even where the application of the rule would not result in an immediate award of benefits.  *Id.* at 593 (*citing Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989).  For example, if claimant is of advanced age and had already experienced a severe delay in her application, or if it appears an ALJ ignored evidence to reach an opposite, pre-determined conclusion.  *Id.*  The factors discussed in *Vasquez* are neither argued nor present in this case.

*Recommendation*

Based upon the foregoing, the ALJ's decision that Webber was not disabled and is not entitled to DIB under Title II of the Act and SSI under Title XVI of the Act was not based on correct legal standards or supported by substantial evidence.  The Commissioner's decision should be REVERSED and REMANDED for additional proceedings.

*Scheduling Order*

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **March 30, 2015**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this ___ day of March 2015

John V. Acosta
United States Magistrate Judge

Page 23 - FINDINGS AND RECOMMENDATION